[Civ. No. 45.   Fourth Appellate District.—January 7, 1930.]

SARI B. FRANKISH, Appellant, v. THE FRANKISH COMPANY (a Corporation) et al., Respondents.

Swing & Wilson for Appellant.

W. E. Byrne, Isaac Jones and Harry A. Reese for Respondents.

MARKS, J.—Appellant brought this action to quiet title to a house and six lots in the city of Ontario, county of San Bernardino, state of California. She claimed to deraign her title through a deed dated August 12, 1924, and alleged to have been executed by The Frankish Company, a corporation, one of the respondents, to appellant, and Charles Frankish, the other respondent. She alleged that Charles Frankish refused to join with her as plaintiff in the action and was, therefore, made a defendant.

The respondent, The Frankish Company, which for brevity will be referred to as the corporation, denied title in appellant and Charles Frankish and asserted title in itself. It alleged that the deed was neither executed nor authorized by the corporation, and was signed without any authority by its president and a former secretary whose term of office had expired prior to his signing the deed; that it was never delivered to the grantees; that it was made without any consideration; and other special defenses that it will not be necessary to notice at this time.

Charles Frankish filed a disclaimer. The court found against appellant and in favor of the corporation on the question of the ownership of the property, as well as on its special defenses and entered judgment accordingly.

Appellant complains of the findings of the court on the grounds that they are not supported by the evidence and are contrary to the evidence, and also of many errors in the rulings of the court on the admission and rejection of evidence during the trial.

We will first consider the evidence in support of the finding that the deed under which appellant claims her title was never delivered by the corporation, for if this finding is supported by the evidence, appellant's action must fail and the judgment must be affirmed, unless there were errors occurring during the trial that were prejudicial to her substantial rights.

The corporation was organized and existed as a corporation for profit. It acted as a holding company with the title vested in it of property formerly owned by Charles Frankish, who, with his sons, daughter and son-in-law, were

its sole stockholders and from among whom its board of directors and officers were selected. It was organized in August, 1912. Charles Frankish had been its president from its organization to a date some little time prior to the trial of this action. Hugh Frankish, one of the sons, was secretary of the corporation prior to and on the morning of August 12, 1924. On this morning a new board of directors was elected by the stockholders and Emil F. Stroth, a son-in-law, was elected secretary. The corporation had its principal office in the city of Ontario. In this office was a large safe in which it kept its books, records and important papers. It contained a separate compartment in which Charles Frankish kept his personal securities and papers.

About six months prior to August 12, 1924, Charles Frankish, who was a widower of the age of about seventy-eight years, met appellant, who was then Mrs. Sari Buffington, a widow of the age of about forty-three years. The acquaintance ripened into courtship and they were first married on August 13, 1924. Seemingly there was some defect in their first ceremony, for they separated in the fall of 1924 and Charles Frankish brought suit for annulment of the marriage. This action was subsequently dismissed and the two were again married on January 13, 1925, and resumed cohabitation. They lived together for some little time and then separated, which separation was permanent. This action was commenced by appellant on March 25, 1926.

Some time in June or July, 1924, the stockholders of the corporation commenced discussing the division of its assets among themselves and the winding up of its affairs. The approaching marriage of Charles Frankish was probably a contributing cause to these discussions. He expressed a desire to receive the Ontario property which is the subject of this litigation as a part of his share in case the division of assets was finally consummated. It had been his home for many years. On August 10, 1924, the discussions reached the point of tentatively estimating the value of the various properties of the corporation, these totaling a sum slightly in excess of $169,000. The proposed division of the assets of the corporation was thereafter abandoned.

The capital stock of the corporation was divided into 750 shares of the par value of $100 each. On August 12, 1924 the ownership of the stock appeared on the books of

the corporation as follows: Charles Frankish, trustee, 250 shares; L. J. Frankish, a son, 115 shares; L. J. Frankish, trustee, 10 shares; R. Evelyn Stroth, a daughter, 125 shares; Emil F. Stroth, trustee, a son-in-law, 125 shares; H. Frankish, trustee, a son, 125 shares. On the afternoon of August 12, 1924, after the election and qualification of the new board of directors and the election of Emil F. Stroth as its secretary in the place of Hugh Frankish, who appears as H. Frankish in the list of stockholders, Charles Frankish asked his son Hugh to prepare a deed to the Ontario property from the corporation to Charles Frankish and Sari B. Frankish. This Hugh did and the deed was then signed by Charles Frankish as president of the corporation and Hugh Frankish as secretary and the corporate seal attached. Hugh then took the deed to a notary public, who attached an acknowledgment. The only authority given the officers to dispose of corporate property was found in a resolution passed on September 3, 1912, by which the president and secretary were authorized to "sell and convey any of the lands of said company at such price or prices and on such terms as they may deem for the best interests of the company." No other authority was given by the board of directors to execute the deed in question.

Up to this point there is no conflict in the testimony before us. In the balance of the evidence there is not so much a conflict in the evidence as there is a conflict on the construction put upon it and the conclusions to be drawn from it by the parties.

In support of the court's finding that the deed was never delivered to either Charles Frankish or Sari B. Frankish we have the testimony of two witnesses. Hugh Frankish testified that he signed the deed as secretary of the corporation because his father requested him to do so, and as he was in the habit of signing conveyances he did not take into consideration the fact that he was no longer secretary. The reason given for drawing and signing the deed was that as Charles Frankish was going to be married the next day and was going away on a wedding trip he desired to have the deed signed and acknowledged to show that he would receive the property if the assets were finally divided among the stockholders. There was no intention of having the deed delivered nor of vesting title in the grantees unless

and until the stockholders should consummate the division of the corporation assets. In case this was finally accomplished, and before delivery, it would be necessary to finally determine and agree upon the value to be placed upon this and each other property of the corporation, which value would be charged against the interest of the stockholder receiving such parcel of corporate property. After the acknowledgment was attached to the deed on August 12, 1924, Hugh returned it to the corporation safe, where he placed in it a compartment containing the corporation papers and not in the compartment used exclusively by his father, after which time he did not again see the deed. The only time that Charles Frankish had physical possession of the instrument, to the knowledge of this witness, was when he attached his signature thereto as president of the corporation.

Charles Frankish corroborated the testimony of Hugh in all particulars. He took up the narrative of the disposition of the deed after it had been placed with the corporation papers in the safe of his son. He testified that without the knowledge or consent of any other stockholder, officer or director of the corporation in the late afternoon of August 12th he took it from among the corporation papers in the safe, "borrowed it," as he described his act, and carried it to the home of Sidney C. Ford, where he met appellant and showed it to her. In reply to questions as to what he said when he showed the deed to her, he replied, "I said the company had agreed to deed the property to me. I could not say the exact words. My recollection is I told her the company had agreed to deed the property to me." On the same evening he returned the deed to the safe and placed it among the papers of the corporation and not in his private compartment. When the witness discovered, in September or October, 1924, that his marriage ceremony was defective, he told one of his sons to destroy the deed, which was not done. Later, appellant and Charles Frankish appeared to have effected a reconciliation and his action to have the marriage annulled was dismissed. He then took the deed from among the company papers where it had reposed up to that time and placed it in his own private compartment, without the knowledge of any other stockholder, director or officer of the corporation. Some time

later, probably in December, 1924, it was removed from the private compartment of Charles Frankish by someone, which, according to the evidence, was the last time its existence appeared. It was not recorded and was not produced at the trial and there is a strong inference that it was destroyed.

To meet this evidence, appellant produced two witnesses besides herself. As to the purported delivery of the deed she testified that on the afternoon of August 12, 1924, she met Charles Frankish on the lawn of the Ford home, when the following occurred: "He said to me—he put his hand in his pocket and pulled out this deed and said, 'the children have signed over the old home to you and I as a wedding gift.' He opened it and handed it to me opened, and I took it . . . I said that was so sweet and kind of the children, and to thank them for me, and I folded it up and handed it back to him and told him to put it in a safe, that I had no place to leave it, as we were leaving in the morning, and he said he would." Sidney C. Ford and Maude L. Ford both were present at this conversation and described it in practically the same language used by appellant.

Upon their return to Ontario, after the marriage, Mr. and Mrs. Frankish occupied the property involved herein, as their home without paying any rent, for about a year, except for the period that Mr. Frankish was absent during the fall of 1924, when only Mrs. Frankish lived there. They moved to another location in Ontario which was referred to as the "Almsley Square" home. Title to this property finally found its way into the name of appellant.

Under the date of February 13, 1925, Charles Frankish caused to be served on his children and his son-in-law a written demand for the return of the deed to the Ontario property and other instruments and personal property, stating that the same had been forcibly and illegally abstracted from his possession without his knowledge or consent. This demand was followed in March, 1925, by a suit in the Superior Court of San Bernardino County, to recover possession of the same personal property to which he asserted ownership. This case was dismissed before trial.

We have detailed the evidence in this case upon the question of the delivery of the deed because it is decisive and

controlling on this appeal. ▮ In this action to quiet title the burden was on the plaintiff to show title in herself and her right to recover necessarily depended on the strength of her own title, and not on the weakness of the one relied upon by the defendant (*Rocky* v. *Vieux,* 179 Cal. 681 [178 Pac. 712].) "A grant takes effect, so as to vest the interest intended to be transferred, only upon its delivery by the grantor" (sec. 1054, Civ. Code). "There is no better established legal principle than that the transfer of the ownership of real estate, so far as the transfer is to be· made by deed, necessitates a delivery of that deed to effectuate the passing of title from the grantor to the grantee. Delivery is the force that vitalizes the instrument without which, though signed and acknowledged, it is invalid, and not effective for any purpose. If delivery is wanting the deed is void *ab initio,* and is no better than a blank form. Consequently it is recognized that prior to its actual delivery, the grantor named in the instrument may change the character of the delivery originally contemplated, and has the right to destroy and nullify the instrument itself." (9 Cal. Jur. 149, and cases cited.) ▮ In an effective delivery of a deed there must be an actual or constructive change of possession of the instrument coupled with an intention on the part of the grantor to transfer the title from himself to the grantee. "It is essential to the validity of a transfer of real property that there be a delivery of the conveyance with intent to transfer the title, and the true test under which delivery is to be determined is in ascertaining whether in parting with the possession of the conveyance, the grantor intended to divest himself of title. If he did, there was an effective delivery of the deed. If not, there was no delivery. The solution of this question is grounded entirely upon the intention of the grantor, and this essential matter of intention is a question of fact to be determined by the trial court from a consideration of all the evidence in a given case bearing upon the question" (*Williams* v. *Kidd,* 170 Cal. 631 [Ann. Cas. 1916E, 703, 151 Pac. 1, 3]; *Hotaling* v. *Hotaling,* 193 Cal. 368 [56 A. L. R. 734, 224 Pac. 455]). ▮ We have no trouble in reaching the conclusion in this case that the evidence amply supports the finding of the trial court that there was no delivery of the deed from the corporation to

Charles Frankish and Sari B. Frankish or either of them. Proof of an intent on the part of the grantor to divest itself of title is lacking.

■ Appellant contends that because of certain admissions in the opening statement of counsel for respondent, it cannot deny the delivery of the deed and quotes from such statement the following: ''It is true the deed was executed. The deed was signed by the company officials on the 12th day of August.'' Reading further in the same statement we find the following: ''It was placed in the company safe and was never delivered to Mr. Frankish and was not to be delivered to him until such time as the arrangement of a settlement of the estate of the company was consummated; that that was never consummated, and our claim is that no delivery was ever made . . . Our claim is there never was any delivery of the deed.'' We do not believe that this can be construed into an admission that the deed was delivered to the grantees or either of them. The case was not tried upon any such theory.

■ Appellant complains of the rulings of the trial court in overruling her objections to questions, the answers to which elicited the information that no consideration had been paid by either Charles Frankish or appellant for the Ontario property, when the deed itself recited a valuable consideration. She invokes the rule that ''evidence of this character cannot be allowed in case of a deed when thereby the legal operation of the instrument to pass the entire interest according to the purpose therein designated would be defeated.'' (*Winchester* v. *Winchester*, 175 Cal. 391 [165 Pac. 965, 966].) It is not necessary for us to pass upon the applicability of this rule to the case before us as the evidence was admissible under another theory. If the corporation had received and retained an actual valuable consideration for the Ontario property it might not have been in a position to assert some of the defenses relied upon by it. It was, therefore, at least entitled to prove it received no consideration for the deed under these defenses.

Appellant contends that the trial court erred in sustaining objections to her offer in evidence of several letters exchanged between Charles Frankish and his children and son-in-law. The greater number of these letters are not

in the record. Without the letters or a statement of their contents before us we cannot determine that the rulings of the trial court were erroneous. ■ It is incumbent upon appellant to show prejudicial error in the rulings of the trial court on the admission or rejection of evidence and a judgment will not be reversed unless such prejudicial error appears. (Art. VI, sec. 4½, Const.) ■ The letters before us serve only to impeach the testimony of witnesses for the corporation on the question of the delivery of the deed to the Ontario property and would go to the weight of the evidence before the trial court. This error, if error it be, was not prejudicial to appellant as the weight of the evidence is something to be considered and passed upon by the trial judge. Where there is any competent evidence to support a finding it will not be disturbed on appeal. There was such evidence in this case.

■ Some of the other rulings of the trial court upon objections to the admission of evidence, and motions to strike testimony, were undoubtedly erroneous, but none of them affects the failure of appellant to prove her title to the Ontario property in that the deed to her was not delivered. This failure in her evidence is fatal to her case and for this reason the errors of the trial court in its rulings upon the admission or rejection of evidence were not prejudicial to her and do not furnish sufficient grounds for a reversal of the judgment.

At the close of the trial, over the objection of appellant, the corporation was permitted to file an amendment to its answer to make its pleadings conform to the proof. While the amendment restated in greater particularity some of the defenses set forth in the original answer, it, in reality, pleaded but one new defense, namely, that the execution of the deed was beyond the powers of the corporation and *ultra vires*. ■ An application to amend the plead-. ings is addressed to the sound discretion of the trial judge and considerable latitude is given him in the exercise of such discretion. The judgment of the trial court is supported by the failure of appellant to establish her title and this court does not need to go beyond this one question to affirm it. Therefore the filing of the amendment becomes unimportant as it is not necessary for us to consider its

allegations in reaching the conclusions that the judgment of the trial court must be affirmed.

Judgment affirmed.

Sloane, P. J., and Barnard, J., concurred.